No. 46,347

Earl Lewis, Sr., Father, and Lilly Lewis, Mother, next of kin of
Earl Lewis, Jr., Deceased, *Appellants*, v. Service Provision Co.,
Inc., and Harold Clayton Watts, *Appellees*.

(496 P. 2d 1373)

Opinion filed May 6, 1972.

*Davis S. Carson,* of Sowers, Sowers, Carson & Johnston, of Wichita, argued
the cause and was on the brief for appellants.

*Jerry G. Elliott,* of Foulston, Siefkin, Powers & Eberhardt, of Wichita, argued
the cause, and *Robert M. Siefkin,* of the same firm, was with him on the brief
for appellees.

The opinion of the court was delivered by

Fatzer, C. J.: This is an appeal from a judgment in favor of the
defendants in an alleged wrongful death action.

In a way, it may be said the chief controversy is the absence of
facts rather than a dispute over the facts.

The plaintiffs, Earl Lewis, Sr., and Lilly Lewis, brought this action
seeking recovery for the death of their 16-year-old son who died as
the result of a collision between an automobile and a tractor-truck
on Highway I-35 near Guthrie, Oklahoma.

Earl Lewis, Jr., plaintiffs' decedent, left Wichita about 8:00
o'clock p. m. on January 10, 1969, with his mother's admonition that
he was not to leave Sedgwick County. At about 10:00 o'clock p. m.,
a reddish colored 1956 Chevrolet with the number 38 painted on
it and containing four boys and two girls, one of which was plain-
tiffs' decedent, stopped at the Arrow Motel in Guthrie, Oklahoma.
Michael Kirk registered, stating his party was driving a 1966 Chevro-
let with license number SG 16616. He paid for a room for two
people. The car was in fact a 1956 Chevrolet and the license on the
car was SG 174103.

The young people were in the motel for a short time. However, they took the mattress off the box springs and put it on the floor. They then put the top sheet and a blanket on the mattress, and put the bottom sheet and bedspread over the box springs. They were making beds for more than two people.

When the young people left the motel in the 1956 Chevrolet, only one taillight was on, or the taillights were so dim it was difficult to see them. As the Chevrolet started to enter the highway, the motor died, and it took ten or fifteen minutes to get it started. They then drove into a service station at Guthrie and apparently made some motor adjustments.

At about 11:00 o'clock p. m., one of the defendants, Harold Clayton Watts, was driving a tractor-trailer for the Service Provision Company, Inc., containing fresh beef, and was about five miles south of Guthrie on Highway I-35, a four-lane highway. He was traveling south, and as he came over a rise the Chevrolet, also traveling south, was pulling off onto the shoulder of the highway. Watts continued driving in the outside lane. When he was approximately 50 to 75 feet from the Chevrolet it suddenly pulled back onto the highway directly in front of him. Mr. Watts testified:

"Well, I was driving up—I was coming up a long hill. It had kind of a drawn out curve in it. And I topped over this hill and started down it on the other side and I observed this car on the highway. He was pulling over to the shoulder of the road about the time I observed him. So, I just supposed that he was going over there to stop.

"I saw, if there was lights on this car, that they were very dim, but I could still see the bulk of the car in the road and so as I was going on, I, of course, checked the traffic behind me and there was a truck coming up close behind me and I believe it was another car behind him . . . [M]y road was clear ahead of me and I thought—I didn't think any more about pulling over because the car was completely on the shoulder at this time . . . But, this car had not stopped to my knowledge and I supposed everything was safe, nobody would pull out in front of the truck or other traffic. I had my head-lights on, but this is what happened. I glanced back in the mirror to check the traffic between—which this is a constant thing we do all the time; we want to know what is in front of us and what is behind us—and as I looked back, this car, it looked to me like maybe he was trying to make a U-turn or something. He came off the shoulder of the roadway right directly in front of my truck and I don't even remember if I had time to apply the brakes or not . . ."

Watts further testified:

"When I first observed the car pulling off on the shoulder, I may have taken my foot off the accelerator a bit—I don't really remember. I know I tried to

turn my truck to miss the car, but I hit it anyway. When the car pulled out in front of me, I could see mostly the side of the car, rather than the back of it. I tried to turn the truck to the left; I don't know how far down the road after impact the car caught fire—I thought at the time I was still on the highway when the car ignited.

"The car pulled off on the shoulder; my lane of traffic was clear and I didn't think at the time it was necessary to slow down. I didn't know I was overweight that night, but I now know I was about 5,000 pounds overweight. I estimate my speed at impact at about 60 mph."

The license tag SG 174103 on the Chevrolet belonged to plaintiffs' decedent, Earl Lewis, Jr., and had been taken from a 1958 Plymouth which he owned. It is conceded the Chevrolet was being operated with young Lewis' consent and permission although its true ownership was never established.

All six of the young people riding in the Chevrolet were killed. The highway patrol found an empty Schlitz beer can and a one-gallon jug which had contained Bali Hai wine in the wreckage of the Chevrolet. The seal had been broken on the wine jug.

Bob C. Baker was driving north on I-35, and was the only eye-witness to the accident other than the driver of the truck. He testified:

"The truck didn't have a chance to miss that car—it pulled right out in front of him. He tried to miss the car, the truck swerved to the left but he couldn't miss the car. I could not swear at the time there was anyone in the car going over the embankment, but I do swear I never saw a car run down the road with no one in it. I did not know the driver of the truck. The man driving the truck did everything in his power to avoid the accident."

The jury heard the case and returned a verdict in favor of the defendants. It also answered two special questions which were submitted by the district court at the plaintiffs' request:

"No. 3. Do you find that the decedent was guilty of negligence? ANSWER: Yes. 4. If you answer No. 3 yes, what act or acts of negligence do you find against the decedent? ANSWER: Passenger or driver failed to observe oncoming traffic from the rear and give warning."

The plaintiffs have appealed. The issues raised may be summarized as follows: First, should the district court have directed a verdict in favor of plaintiffs and against the defendants on the issue of liability only at the conclusion of all of the evidence, and second, was there sufficient evidence to justify submission to the jury the question of contributory negligence.

In considering a motion for a directed verdict all evidence and all inferences reasonably to be drawn therefrom must be considered in the light most favorable to the party against whom it is directed. Such evidence must be accepted as true and all unfavorable evidence disregarded. In *Diaz v. Duke*, 206 Kan. 650, 482 P. 2d 48, it was held:

"In determining whether as a matter of law a defendant is guilty of negligence making him liable for the injuries the plaintiff may have sustained, all of the testimony favorable to the defendant must be accepted as true, and if the facts are such that reasonable minds might reach different conclusions thereon, the question must be submitted to the jury and cannot be determined by the district court as a matter of law." (Syl. ¶ 1.)

The trier of fact has the responsibility of weighing the evidence and determining what testimony will be believed. (*Horton v. Montgomery Ward*, 199 Kan. 245, 249, 428 P. 2d 774.)

After a careful study of the record we find no evidence of any negligence on the part of the defendant truck driver which contributed to the accident or the resulting death. Watts was traveling at a speed of 60 miles per hour. He saw the Chevrolet about 300 feet in front of him when it pulled off onto the shoulder which was twelve feet wide. The Chevrolet slowed but did not stop, and when Watts was about 50 or 75 feet from it, the driver of the car pulled out directly in front of him. There is no Oklahoma statute which required Watts to change traffic lanes under such circumstances. As we have previously stated, the only eyewitness to the collision testified:

"The truck didn't have a chance to miss that car—it pulled right out in front of him. He tried to miss the car; the truck swerved to the left but it couldn't miss the car."

The turning of the Chevrolet from the shoulder onto the highway immediately in front of the truck was the proximate cause of the collision. Although it was not established which of the six persons was driving, certainly the driver of the tractor-trailer had no control over the Chevrolet.

The plaintiffs attempt to make an issue of the fact that the truck was 5,000 pounds overweight under the Oklahoma law. The truck was carrying some 48,190 pounds. There was to have been 24,000 pounds unloaded at Okmulgee, Oklahoma. The overall load, including the tractor-trailer, was 78,190 pounds. The evidence

showed the legal overall load in Oklahoma was 73,000 pounds. However, an expert witness from the Wichita police department testified as to the distance it would take to move the tractor-trailer from one lane to another going 60 miles per hour. He stated that considering either the legal load or the actual load, the move would require a reaction time of 66 feet and an additional 305 feet to move the tractor-trailer from one lane to the other—a total of 371 feet.

It is readily apparent that regardless of the overload, the driver of the tractor-trailer could not have avoided the collision.

The violation of a traffic law does not establish actionable negligence as a matter of law unless it is made to appear that the violation was the proximate cause of the injury. In *Applegate v. Home Oil Co.*, 182 Kan. 655, 324 P. 2d 203, we stated:

". . . It is likewise settled that mere violations of traffic laws are not themselves sufficient to make the operator of a motor vehicle guilty of actionable negligence in a collision of automobiles; to make him liable it must appear that the violation contributed to the collision and was a proximate cause of the injury sustained. (*Clark v. Southwestern Greyhound Lines*, 148 Kan. 155, 79 P. 2d 906; *Crawford v. Miller*, 163 Kan. 718, 186 P. 2d 116; *Ripley v. Harper*, 181 Kan. 32, 309 P. 2d 412.)" (l. c. 661.)

The defendant driver of the tractor-trailer having been guilty of no negligence which was a proximate cause of the injury, there could be no liability either on his part or that of his employer to the plaintiffs for the death of their decedent. It would serve no useful purpose to discuss the question of contributory negligence on the part of the plaintiffs' decedent.

The judgment is affirmed.